**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA**  ) | |
| ) | **CRIMINAL ACTION FILE** |
| **v.**                )  | |
| ) | **NO. 1:14-CR-102-TCB-AJB** |
| **RICKY BERNARD TOLBERT,**    ) | |
| ) | |
| **Defendant.**      ) | |

**UNITED STATES MAGISTRATE JUDGE'S ORDER**
**AND FINAL REPORT AND RECOMMENDATION**

Defendant Ricky Bernard Tolbert ("Tolbert" or "Defendant") is charged in a single-count indictment with possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). [Doc. 1]. Before the Court are Tolbert's motion to suppress statements, [Doc. 15], and motion to suppress evidence from an unlawful arrest and seizure, [Doc. 16]. Also before the Court is the government's motion to reconsider the District Court's order granting Defendant's motion for an emergency medical evaluation. [Doc. 47].

For the reasons set out below, the undersigned **RECOMMENDS** that the motions to suppress, [Docs. 15, 16], be **DENIED**. The Court **GRANTS** the motion for reconsideration, [Doc. 47], and **RECOMMENDS** that the District Court vacate its

earlier order, [Doc. 46], directing that Defendant be transferred to a federal medical facility to undergo an emergency medical evaluation.

## I.    Motions to Suppress, [Docs. 15, 16]

### A.    Facts

#### 1.    Tolbert's arrest and seizure of a firearm

Evidence was presented on the motions to suppress on July 1, 2014. [Doc. 32 (hereinafter "T_")].[1]  On the overnight shift starting on November 1, 2013, College Park, Georgia, Police Officer Casey Smith was a plainclothes investigator "riding the hotels" on the south side of the city in response to recent auto thefts and break-ins.[2]  T9, 11.  Smith was dressed in blue jeans, a t-shirt and a "jumpout vest" with "POLICE" written on the front and back.  T10.  His police badge also hung on a chain

---

[1]    Magistrate Judge Walker presided at the July 1, 2014, evidentiary hearing.  [Doc. 32 at 1].  Judge Walker recused on October 21, 2014, and the case was reassigned to the undersigned.  [Doc. 33].  Counsel for the parties advised the undersigned that no new evidentiary hearing was necessary and that they consented to the undersigned's issuing a Report and Recommendation on the July 1, 2014, evidentiary hearing record and the parties's papers.

[2]    Smith had been a police officer for five years, and he served as an investigator for half of that time.  As of November 2013, he had been an investigator for about two years.  T9-10.

2

around his neck and was clipped to his vest.  T10.  He was in an unmarked police vehicle.  T10-11.

Shortly after midnight on November 2, 2013, uniformed patrol officers had received a dispatch report of a person shooting a gun in the parking lot of an apartment complex at 2601 Roosevelt Highway, but when they investigated, they could not locate anyone.  T11-12, 15, 54.  Smith also heard the call over the police radio.  T12.[3] At 1:07 a.m., about thirty to forty minutes after the first call, dispatch again reported gunshots at that location, and Smith responded because he was close by.  T12, 15, 26. Smith had previously responded to many calls at that apartment complex while on patrol, and he had participated in many narcotic buys at the complex when he was on special detail.  T12.  He had visited that location more than fifty times.  T13.  Smith described the apartment complex as being made up of single-level apartment buildings, with a single entrance into the complex that led to two sets of buildings arranged in a U-shape on the left and a set of buildings parallel to one another towards the rear.  The individual apartment buildings were identified by letters.  T13.  Building K was at the very rear of the complex.  T14.

---

[3]     College Park Police Officer Emory was one of the uniformed officers that responded to the first call.  Those officers were unable to locate the source of the shooting.  T54.

The dispatch report announced that the person who called in the report of shots fired did not want to be contacted but that the caller described the shooter as a tall black male, white shirt and possibly intoxicated or drunk.  T16.[4]  The caller, whose location was reported as between Buildings J and K at 2601 Roosevelt Highway, was still on the phone with dispatch as the broadcast was being sent out, and the caller reported being able to see the person she was describing.  T17-18.

At approximately 1:10 a.m., Smith entered the complex and drove slowly to the rear, and as he approached the front of Building J, at a distance of about fifty yards, he observed a person outside of Building K.  T19, 26.  Smith described the person he saw as a tall black male with a white v-neck t-shirt staggering back and forth in front of Building K, and the person Smith saw matched the caller's description of the person firing a weapon.  T20, 27-28.[5]  He did not see anyone else outside.  T23.  There was very little illumination.  T37.  Smith got out of his vehicle at a distance of twenty to thirty yards from the man (later identified as Defendant) and identified himself as a police officer.  Tolbert appeared lost.  Smith asked Tolbert if anything was

---

[4]     The dispatcher relayed that reported shooter was "possibly 28," which is radio code for "possibly intoxicated or drunk."  T16.

[5]     The man Smith saw was also wearing glasses and tan or khaki pants.  T27.

4

wrong.  Tolbert put his right hand in his back pocket, yelled "I haven't done nothing wrong," and started running down the sidewalk.  T20-21, 28, 36.  Tolbert was running with his hand in his back pocket.  T37.  Smith directed him to show his hands.  T26.[6] Smith gave chase, trying to shine his flashlight on him.  T21.  Smith again announced he was a police officer.  T25.  As they turned the corner of the building, Tolbert took his hand out of his pocket, but continued to run another fifteen to twenty yards before he stopped and turned around.  T21, 25-26, 37, 41.  It was darker behind the building than it was in the front.  T39.  Smith drew his weapon and shined his flashlight on Tolbert.  T21, 38.  Again, Tolbert stated that he had not done anything wrong; he appeared intoxicated and was walking in circles.  T21.  Smith told him to get on the ground and show his hands.  T26.

Tolbert then put his hand in his pocket again, turned around, and got on his knees.  T21-22, 38.  Smith approached him and directed him to take his hand out of his pocket, but Tolbert did not comply.  Smith jumped on him and attempted to handcuff him.  Other officers arrived and assisted Smith as he was completing the cuffing.  T22, 39-40.  A wallet was located in Tolbert's back right pocket.  T22.  College Park Police Officer Boston located a revolver sitting exposed in the leaves and grass next to

---

[6]     Smith also may have told Tolbert to get on the ground.  T26.

5

the path that Smith and Tolbert had just been running upon, about fifteen feet away from the site of Tolbert's arrest.  T22, 40-41, 48, 50.  Smith recorded the time he handcuffed Tolbert as 1:12 or 1:13 a.m.  T26.

The officers took Tolbert around to the front of the building, where another individual showed up.  This other person reported that he was Tolbert's friend; he also was intoxicated, and the police did not get his name.  T23.  Because Tolbert was intoxicated, he laid down in the back of the police car and was transported to jail by College Park Police Officer Emory.  T24, 54.  Smith could tell Tolbert was intoxicated because he smelled of alcohol, his speech was slurred, and he was staggering.  T24-25.  He was also crying.  T41.

### 2.    *Tolbert's post-arrest statements to federal officers*

Almost two weeks later, on November 14, 2013, at approximately 10:00 to 10:30 a.m., ATF Special Agents Shawn Lee and Alan McLeod[7] and ATF Task Force Officer Brian Ernest went to the Fulton County Jail where Tolbert was still being held in order to interview him about his possession of the firearm.  T59, 62.  They did not seek to contact his state-court lawyer.  T79.  McLeod was familiar with Tolbert's

---

[7]        McLeod had been an ATF agent since 2005.  As of the date of the evidentiary hearing in this case, McLeod had conducted in excess of 200 to 250 suspect interviews.  T58-59.

6

criminal history but was not aware of Tolbert having any mental disabilities.  T81.
They met with him in an attorney-interview booth.  T60.  They were separated from
him by a glass partition with a narrow slit to pass papers through.  T60.  They had
requested of the jail that Tolbert be given a pen so that he could sign a *Miranda* waiver
if he wanted to.  T60.  Tolbert was seated alone on his side of the partition, which was
separated from the inmate side of the jail pod by a glass door.  The agents had two
chairs in their side of the interview booth, and the door was open in order to allow
Ernest to overhear the interview.  T60-61.

Tolbert was dressed in his Fulton County Jail outfit but was not otherwise
restrained by handcuffs or shackles.  T62.  The agents were dressed in plainclothes golf
shirts and were not armed.   T63.   They showed Tolbert their law enforcement
credentials.  T64.  They identified themselves and asked him if he understood what the
ATF was, and Tolbert acknowledged that he did.  T64, 74.  They explained that they
were there to talk to him about the federal investigation into the revolver and not any
state charges against him, T64, 69, although they asked him what state charges were
pending against him and what his bond was, T67-68.

Tolbert identified himself and was advised that the agents needed to read him
*Miranda* rights and have him waive those rights before they questioned him.  T64-65.

7

Tolbert made eye contact with the agents and appeared to understand what they were saying.  McLeod described Tolbert's responses as "concise, candid and clear," and stated that Tolbert appeared to remember most details about the night of his arrest, the medications he was on or had taken, and the charges and bond on which he was held. T65.  He did not appear to be under the influence of alcohol or drugs, nor did he appear to suffer from any mental or physical disability.  T65-66.

Lee read the *Miranda* rights to Tolbert line by line, and Tolbert either nodded or responded as to each line.  T66.  Lee then read aloud the waiver portion of the form. T69.  After Lee finished reading the form to Tolbert, the agents slid the form through the slot, and Tolbert signed it with the pen (presumably) provided him at the jail.  T66. Tolbert signed and printed his name, and gave the form back to the agents.  T70.  Lee signed as a witness.  T68, 69, 70.  Tolbert did not ask any questions about the form or express any concerns about it.  T70.

8

The *Miranda* form provided, in relevant part, as follows:

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives          **Advice of Rights and Waiver**

_____

**Statement of Rights**

•       You have the right to remain silent.

•       Anything you say can be used against you in court.

•       You have the right to talk to a lawyer before we ask you any questions and to have a lawyer with you during questioning.

•       If you cannot afford a lawyer, one will be appointed for you if you wish before any questioning begins.

•       If you decide to answer any questions now without a lawyer present, you have the right to stop answering at any time.

**Waiver**

I have read this statement of my rights or it has been read to me, and I understand these rights.  At this time, I am willing to answer questions without a lawyer present. No promises or threats have been made to me, and no pressure or force of any kind has been used against me.

Signature:          *s/ Ricky Tolbert*

Printed Name:          *Ricky Tolbert*

Witness Signature:          *s/ C. Shawn Lee*
Printed Name:          *C. Shawn Lee*
Date/Time:          *11/14/13     10:20 AM*

Govt. Ex. 1 (handwritten entries in italics); T77.

9

As he was signing the form, Tolbert spontaneously stated "I simply found the gun" or "I just found that gun." T70. Once they received the form back from Tolbert, the agents questioned him about his spontaneous statements. T71. He explained that he was drinking gin with some neighbors or acquaintances; he picked up the firearm when he saw some young individuals who were running through the cut-through drop it; he saw that it was loaded; and when he pulled the trigger, it went off. T72. He appeared confused as of the time of day of the incident, which he stated occurred in daylight, so McLeod read him the College Park police report, which Tolbert stated he had not seen. T71, 72, 80. He agreed with the report, other than the time of the incident. T72. Tolbert drew a drawing of the area of the incident. T77-78. Tolbert was cooperative, and his answers were responsive to the agents' questions. T73.

McLeod asked him about the medications he was taking. Tolbert listed the medications he was taking, which mainly were medications for mental disorders. McLeod was unfamiliar with most of them.[8] T76, 79. Tolbert also reported that he was

---

[8]     The medications for mental disorders that Tolbert reported he was taking were Risperdal, Seroquel and Thorazine. T79. Risperdal (generic name: risperidone) is a medicine used to treat schizophrenia (a brain disorder that distorts the way a person thinks, acts, expresses emotions, perceives reality, and relates to others). It is also used alone or in combination with lithium or valproate to treat short term manic episodes (a period of abnormally and persistently elevated or irritable mood) or mixed episodes (a state of depressed mood and loss of interest or pleasure in nearly all activities)

AO 72A
(Rev.8/82)

taking Benadryl, possibly for allergies.  However, Tolbert did not appear confused, nor did he manifest a mental disorder during the questioning.  T76.

Towards the end of the questioning, Tolbert asked whether he was going to be charged federally.  T74.  The agents advised that the decision would be up to the U.S. Attorney's Office, based in part on the report that the agents prepared, and that they would pass along that he was candid and cooperative.  T74, 76-77.  However, no promises were made to him.  T74-75.  Tolbert told the agents where he would be located if he made bond on the state charges.  T77.

Tolbert's sister, Sandra Hill, testified that as a teenager, Tolbert began having mental problems and was diagnosed with schizophrenia.  T85.  He did not finish high

---

associated with bipolar I disorder.  Physicians' Desk Reference website, http://www.pdrhealth.com/drugs/risperdal (last visited 4/28/2015).

Seroquel XR (generic name: quetiapine) is a medicine used to treat schizophrenia. This medication can also be used to treat bipolar disorder alone or in combination with lithium or divalproex. Also, Seroquel XR is used to treat major depressive disorder in combination with other antidepressants.  Physicians' Desk Reference website, http://www.pdrhealth.com/drugs/seroquel-xr (last visited 4/28/2015).

Thorazine (generic name:  chlorpromazine) is used for treating certain mental or mood disorders (e.g., schizophrenia), the manic phase of manic-depressive disorder, and anxiety. Drug Information Database, http://www.drugs.com/cdi/thorazine.html (last visited 4/28/2015).

school.  *Id.*  At the time of his arrest, Tolbert was residing in a mental health program.

T87.  Hill reported that as long as Tolbert took his medications, he was "fine."  T89.

Following the evidentiary hearing, a briefing schedule was set directing Defendant to file the opening brief.  [Doc. 25].

### B.     Discussion

#### 1.     Motion to Suppress Evidence, [Doc. 16]

In his post-evidentiary hearing brief, Tolbert did not present any argument concerning his initial arrest or the seizure of the firearm.  [*See* Doc. 31].  Although the government has the burden of establishing the validity of a warrantless arrest or seizure, Defendant has the burden of establishing a reasonable expectation of privacy in the item searched for or seized.  *See, e.g., United States v. Bachner*, 706 F.2d 1121, 1126 (11th Cir. 1983) ("If the movant establishes an expectation of privacy and that the search and seizure took place without a search warrant, then the burden shifts to the state to establish that an exception to the search warrant requirement was applicable in the subject case and that the search and seizure was, in fact, a reasonable one.") (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971)).  At the evidentiary hearing, the government challenged Defendant's standing to challenge the seizure of the

12

firearm.[9]  T6.  Since Defendant did not raise any argument that he had an expectation of privacy in the weapon, the undersigned **RECOMMENDS** that the District Judge find that Tolbert abandoned his motion to suppress evidence, including the firearm.  *See United States v. Carter*, 776 F.3d 1309, 1327 (11th Cir. 2015) (argument not raised in brief is deemed abandoned); *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (holding that a party abandons claims that he does not argue in his brief).  *Cf. Thomas v. Bed Bath & Beyond, Inc.*, 508 F. Supp. 2d 1264, 1285 (N.D. Ga. 2007) (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (explaining that when a party fails to address a claim in a responsive brief, the claim has been abandoned)).

Even if Tolbert had not abandoned his motion to suppress evidence, the Court still would recommend its denial.  First, by not establishing his expectation of privacy in the firearm, the evidence at the hearing, at best, established that Tolbert discarded the

---

[9]        The undersigned recognizes that the Supreme Court disapproves of the use of the word "standing" in discussing whether a person challenging a search or seizure has a legitimate expectation of privacy.  *See Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978); *see also United States v. Hawkins*, 681 F.2d 1343, 1344-45 (11th Cir. 1982). However, the undersigned will use the word "standing" when referring to whether Defendant has an expectation of privacy because courts routinely use "standing" as "shorthand for the existence of a privacy or possessory interest sufficient to assert a Fourth Amendment claim."  *United States v. Daniel*, 982 F.2d 146, 149 n.2 (5th Cir. 1993).

firearm prior to his apprehension and thus is without standing to challenge it.  *United States v. Merricks*, 572 Fed. Appx. 753, 758 (11ᵗʰ Cir. July 17, 2014) ("Because he voluntarily abandoned it while being pursued by law enforcement, Merricks also lacks standing to challenge the seizure of the firearm.") (citing *United States v. Tinoco*, 304 F.3d 1088, 1117 (11ᵗʰ Cir. 2002) (where cocaine was seized by Coast Guard after it was thrown overboard by crew members, crew members were deemed to have effectively abandoned contraband and thus had no Fourth Amendment standing to challenge seizure).

Second, the Fourth Amendment was not implicated until Tolbert complied with Smith's directions and was seized when he essentially surrendered.  *California v. Hodari D.*, 499 U.S. 621, 628-29 (1991) (holding that a seizure by means of show of authority requires both a show of authority and submission to that authority); *United States v. Jordan*, 635 F.3d 1181, 1186 (11ᵗʰ Cir. 2011) ("When a suspect flees from the police, he is not submitting to their authority and therefore is not seized.") (citation omitted).  By that point in time, assuming Tolbert previously possessed the firearm, he had discarded it on the path, and it was located in plain view and subject to seizure. *United States v. Smith*, 459 F.3d 1276, 1290 (11ᵗʰ Cir. 2006) ("The 'plain view' doctrine permits a warrantless seizure where (1) an officer is lawfully located in the

AO 72A
(Rev.8/82)

place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent.") (citations omitted); *United States v. Bishop*, 338 F.3d 623, 628 (6th Cir. 2003) (holding that "a police officer who discovers a weapon in plain view may at least temporarily seize that weapon if a reasonable officer would believe, based on specific and articulable facts, that the weapon poses an immediate threat to officer or public safety"); *United States v. Bushay*, 859 F. Supp. 2d 1335, 1370-71 (N.D. Ga. 2012) (warrantless seizure of firearm in hotel night stand reasonable to mitigate danger to public of abandoned firearm).

Moreover, to the extent Tolbert contends that his eventual seizure was unlawful, the Court disagrees.  Smith had reasonable suspicion to attempt to detain him and then arrest him since (1) law enforcement received two reports of a weapon discharge at the location; (2) upon Smith's arrival at the place of the reported shots fired, he saw a person matching the description of the suspect given by the eyewitness, *see United States v. Smith*, 318 Fed. Appx. 780, 792 (11th Cir. Mar. 6, 2009) (victim-eyewitness's identification of defendant as man who attacked her that day gave officer not only reasonable suspicion, but also probable cause, to believe defendant had committed a crime) (citing *United States v. Burbridge*, 252 F.3d 775, 778 (5th Cir. 2001) ("An

ordinary citizen's eyewitness account of criminal activity and identification of a perpetrator is normally sufficient to supply probable cause to stop the suspect.")); and (3) after Smith identified himself as a police officer, the suspect (Tolbert) announced that he had not done anything wrong, put his hand in back pants pocket, and began running away. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (nervous and evasive behavior is a relevant factor in determining reasonable suspicion, and flight, the consummate act of evasion, is suggestive of wrongdoing); *United States v. Franklin*, 323 F.3d 1298, 1301 (11th Cir. 2003) (stating that "flight is a relevant consideration for a finding of reasonable suspicion"). As the Eleventh Circuit explained in *Franklin*,

> While flight is not proof of wrongdoing, it is indicative of such. *Wardlow*, [528 U.S. at 124]. Innocent persons might run from police officers; but flight creates an ambiguity; and the officers may stop the person to resolve the ambiguity. [*Id.* at 125].

*Franklin*, 323 F.3d at 1302.

Thus, the motion to suppress evidence, [Doc. 16], is due to be **DENIED**.

## 2.   *Motion to Suppress Statements, [Doc. 15]*

### a.   *Arguments of the Parties*

Tolbert argues that his *Miranda* waiver was not knowingly and intelligently made. He contends that mental illness is a factor to be considered in determining a

16

valid *Miranda* waiver.  In this case, Tolbert points out that he advised the agents that he had "some mental disorders" and that his sister testified that he was diagnosed as a schizophrenic and had pain associated with his physical ailments.  [Doc. 31 at 8].  He also argues that McLeod inquired about his medications to determine Tolbert's state of mind, and despite being told he was on the powerful psychiatric medications, McLeod did not ask about the possible adverse effects of the medication or whether Tolbert was undergoing mental health treatment.  [*Id.* at 8-9].  Tolbert submits that his significant history of mental illness together with his psychiatric medications—particularly when overlayed with McLeod's lack of awareness about these medications—weigh against a finding that the government has established a constitutionally valid waiver.  [*Id.* at 9].

The government argues in response that nothing in the record suggests that Tolbert was experiencing symptoms of his mental illness when he met with the agents, and therefore his waiver was valid.  [Doc. 34 at 6 (quoting *United States v. Quinones*, No. CR410-223, 2012 U.S. Dist. LEXIS 79459, at *9, 2012 WL 2064705, at *3 (S.D. Ga. May 22, 2012) ("[T]he record must establish that, due to a mental disorder . . . , the defendant was in fact unable to comprehend and effectively waive his rights.") (emphasis added by government))].  Instead, the government argues, the record undisputedly demonstrates that Tolbert gave candid and concise answers to the

17

questions he was asked and was cooperative and not confused about what he was being asked. The interview lasted less than thirty minutes and occurred in an interview booth where the agents were separated from Tolbert by a glass partition. The agents were not untruthful to Tolbert, nor did they make any promises or threats to him. [*Id.* at 7-8]. It argues that mental illness by itself does not render a waiver involuntary, but instead requires coercion by a state actor, [*id.* at 8 (quoting *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995), *Coleman v. Singletary*, 30 F.3d 1420, 426 (11th Cir. 1994), and *United States v. Stevenson*, Crim. No. 1:11-CR-350-ODE-RGV, 2012 U.S. Dist. LEXIS 57131, at *8-10 (N.D. Ga. Apr. 23, 2012), and citing *Moore v. Dugger*, 856 F.2d 129, 132 (11th Cir. 1988)]. The government argues that there is no evidence of coercion, and thus Tolbert's waiver was voluntary. [Doc. 34 at 9].

The government next argues that Tolbert's *Miranda* waiver was knowing. It points out that his answers during the questioning were clear, candid, and concise, and that he was cooperative. It also contends that he recalled all except one or two details of the incident. [*Id.* at 10]. It further claims that his demeanor was consistent with a knowing waiver, [*id.* at 10-11 (citing *United States v. Dudley*, No. 1:10-cr-075-CAP-RGV, 2011 WL 1100607, at *7, 2011 U.S. Dist. LEXIS 31171, at *30 (N.D. Ga. Feb. 3, 2011) (R&R), *adopted at* 2011 WL 1060659

18

(N.D. Ga. Mar. 24, 2011)), noting that he made eye contact during the questioning.  He also did not appear to be under the influence or have a mental or physical disability.  [*Id.* at 9-10].  The government also contends that he understood his rights since he had prior criminal justice system experience due to his prior arrests. [*Id.* at 10].

The government further contends that although Tolbert did not complete high school, he nonetheless had the capacity to waive his rights, and his conduct demonstrated that he understood his rights since he did not ask for clarification, stop the interview, request counsel, or otherwise indicate that he did not understand his rights.  [*Id.* at 10-11].[10]

### b.   Discussion

Pursuant to the Fifth Amendment, no person "shall be compelled in any criminal case to be a witness against himself."   U.S. Const. amend. V.   Therefore, under *Miranda v. Arizona*, 384 U.S. 436 (1966), "evidence obtained as a result of a custodial interrogation is inadmissible unless the defendant had first been warned of his rights and knowingly waived those rights."   *United States v. Parr*, 716 F.2d 796, 817 (11th Cir. 1983); *see also United States v. Wright*, 300 Fed. Appx. 627, 632

---

[10]      Tolbert did not file a reply brief.  (*See* Dkt.).

(11th Cir. Nov. 12, 2008).  The government has the burden to show by a preponderance of the evidence that the defendant made a knowing, voluntary, and intelligent *Miranda* waiver.  *United States v. Farris*, 77 F.3d 391, 396 (11th Cir. 1996); *United States v. Glover*, 431 F.3d 744, 748 (11th Cir. 2005).  An accused effectively waives his *Miranda* rights if he: (1) voluntarily relinquishes them as the product of a free and deliberate choice, rather than through intimidation, coercion, or deception; and (2) makes his decision with the full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them.  *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995).  That is, a waiver is effective where the "totality of the circumstances surrounding the interrogation reveal[s] both an uncoerced choice and the requisite level of comprehension."  *Id.* (quotation marks omitted).  "An express written or oral statement of waiver . . . is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver."  *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *United States v. Johnson*, 379 Fed. Appx. 964, 968 (11th Cir. May 24, 2010).

In this case, Tolbert relinquished his *Miranda* rights freely and deliberately, rather than through intimidation or coercion.  The focus of the voluntariness inquiry is on whether the defendant was coerced by the government into making the statement:

20

"The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (alteration and internal quotation marks omitted).  The Court must consider the totality of the circumstances in assessing whether any police conduct was "causally related" to the confession.  *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988).  This totality-of-the-circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of "an essentially free and unconstrained choice."  *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989).  Among the factors the Court should consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *Gonzalez*, 71 F.3d at 828.  However, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent . . . ."  *Gonzalez*, 71 F.3d at 828 (citations omitted).  Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that

21

induces a confession.  *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984).  In addition, in any arrest or custodial situation there is present a degree of duress.  The question is whether the officers used coercive tactics or took unlawful advantage of the situation to obtain the statements.  *Cf. United States v. Jones*, 475 F.2d 723, 730 (5th Cir. 1973)[11] (discussing consent to search following arrest).  Moreover, while a defendant's mental condition is a " 'significant factor' " in the " 'voluntariness calculus,' " *Miller*, 853 F.2d at 1536 (quoting *Connelly*, 479 U.S. at 520), even the interrogators' knowledge that a suspect may have mental problems does not make the suspect's statement involuntary unless " '[t]he police exploited this weakness *with coercive tactics*.' "  *Miller*, 853 F.2d at 1357 (quoting *Connelly*, 479 U.S. at 521 (emphasis in *Miller*).

Relatedly, where a defendant suffers from a mental disorder, courts have held that the existence of the disorder itself does not make a *Miranda* waiver unknowing or involuntary:

---

[11]      In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to September 30, 1981.

> . . . [I]t is not sufficient for a defendant merely to show that he was mentally ill; rather, he must establish that his mental state had the actual effect of rendering his statements to law enforcement unknowing or involuntary. Nor is it sufficient for a defendant to show that his mental state could have impaired him to the point that his statements cannot be considered a product of a free mind and rational intellect; instead, the record must establish that, due to a mental disorder, the defendant was in fact unable to comprehend and effectively waive his privilege against self-incrimination.

*Gray v. Crews*, No. 3:12cv375/LAC/EMT, 2013 WL 3282888, at *14 (N.D. Fla. June 26, 2013); *see also Mills v. Sec'y, Dept. of Corrs*, No. 4:12cv255-WS, 2015 WL 541301, at *18 (N.D. Fla. Feb. 9, 2015) (same); *Quinones*, 2012 WL 2064705 at *3 (same).

Applying the relevant factors demonstrates that Tolbert's *Miranda* waiver was constitutionally valid. First, the government's proof established that Tolbert was intelligent enough to make an informed uncoerced choice. Although Defendant was not a high school graduate, the record reflects that Defendant made eye contact with the agents, appeared to understand the advice of rights, and was able to sign and write his name. He recalled the medications that he was taking, drew a diagram of the scene, and asked the agents whether his case was going to be prosecuted federally. He also advised the agents where he would be if released on bond from the state charges.

Second, although Tolbert was incarcerated, his incarceration did not prevent his ability to choose whether to waive his rights or not.  First, the mere fact that Tolbert was in custody does not, alone, establish coercion.  *See United States v. Thompson*, 422 F.3d 1285, 1296 (11th Cir. 2005) (explaining that a finding of involuntariness under Fifth Amendment's Due Process Clause requires as a prerequisite coercive government conduct such as "subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces the confession" (quotation marks omitted)).  Second, the fact that he had been in state custody for a number of weeks before being asked to waive his rights does not, without more, mandate a finding that his waiver of *Miranda* rights was involuntary. *See United States v. Jones*, 104 F.3d 193, 195 (8th Cir. 1997) (fact that defendant was in tribal custody for three weeks prior to waiving his rights to FBI agents did not render his waiver involuntary).

Third, the nature of the interrogation prior to his waiver of rights was not indicative of an involuntary waiver.  Tolbert was advised that before the agents questioned him, they had to read him his rights and seek his waiver, and he spontaneously began speaking about the firearm as soon as he signed the *Miranda* waiver form.

24

Fourth, there is no evidence whatsoever of police coercion.  Although Tolbert was in custody of the local authorities, he was not handcuffed or shackled during the questioning by the federal agents.  The agents were not armed, nor were they able to personally restrain or physically touch Tolbert since they were on the other side of a glass partition.  None of the questioning officers were involved in his initial arrest. There is no evidence that he was advised that he had to remain in the booth and could not rejoin the prison population.  Moreover, the agents did not threaten him or make him any promises in order to get him to sign the waiver form, other than to tell him that they wanted to talk to him about the federal investigation of the firearm and would not question him about the state case except as to what he was charged with and any bond which he had been granted.

As for Defendant's claim that he suffered from mental disorders, there is no evidence in the record indicating that on the day the agents questioned him, Defendant was affected by any such disorders.  He did not appear to be suffering from any mental disorder, nor did his answers suggest that he was.  He similarly did not complain to the officers about physical pain.  He answered questions in clear, candid, and concise manner.  He told the agents which medicines he was taking, and it is significant that even his sister testified that if he took his medications, he was "fine."  T89.  Defendant

25

has not cited, and the Court is not aware of, any authority which requires investigating officers to delve deeper into a suspect's mental condition prior to seeking his *Miranda* waiver, at least where the suspect manifests no outward objective symptoms that the mental disorder is affecting his cognition.

Thus, the Court finds that Tolbert was able to voluntarily waive his *Miranda* rights and did so.

The Court also concludes that Tolbert's waiver was knowing and intelligent. The rights and waiver form were read to him, and he acknowledged each of the rights contained in the form as it was being read to him. He also signed the form by printing his name and affixing his signature. The rights form was an accurate recitation of the *Miranda* rights and the consequences of waiving those rights.

Therefore, for all of the above reasons, the undersigned **RECOMMENDS** that Tolbert's motion to suppress statements, [Doc. 15], on the grounds that he did not voluntarily waive his *Miranda* warnings, be **DENIED**.[12]

---

[12]     The parties did not discuss the voluntariness of Tolbert's statements independent from whether his waiver was voluntary. Nonetheless, the Court concludes that his statements were voluntary. Voluntariness of statements is analyzed similarly to voluntariness of the *Miranda* waiver. Again, however, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent . . . ." *Gonzalez*, 71 F.3d at 828 (citations omitted). Sufficiently coercive

## II.     Motion for Reconsideration, [Doc. 47]

The government urges the reconsideration of the District Court's order directing that Tolbert be transferred to a federal medical facility to be treated for his prostate cancer.  Pursuant to Local Rule 7.2(E), "[m]otions for reconsideration shall not be filed

---

conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *Castaneda-Castaneda*, 729 F.2d at 1362-63. Isolated incidents of police deception, *id.*; *Frazier v. Cupp*, 394 U.S. 731, 739 (1969); and discussions of realistic penalties for cooperative and non-cooperative defendants, *see United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992); *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990), are normally insufficient to preclude free choice.

In the present case, for the reasons stated above in the text about his *Miranda* waiver, Tolbert's statements were voluntary.  Also, his statements to the effect that he found the gun were spontaneous and not subject to police questioning, and thus voluntarily made.  *Cf. Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir. 1991) ("Voluntary and spontaneous comments by an accused, even after Miranda rights are asserted, are admissible evidence if the comments were not made in response to government questioning"); *United States v. Savell*, 546 F.2d 43, 45-46 (5th Cir. 1977) (concluding that *Miranda* does not apply "where the statements were unsolicited, spontaneous and freely made prior to any attempted interrogation"). The agents also did not deceive him; they advised him they wanted to question him about the federal investigation, that whether he would be prosecuted federally was up to the U.S. Attorney, and that they would advise the prosecutor of Tolbert's cooperation and candor.  His conduct during the questioning demonstrated voluntariness, including drawing a diagram for the agents and advising them where he would be living upon his release from state custody.  Finally, the questioning was relatively short, lasting only thirty minutes.  Thus, his statements to the federal agents were voluntary.

27

AO 72A
(Rev.8/82)

as a matter of routine practice." N.D. Ga. R. 7.2(E).[13] The decision to grant a motion for reconsideration is committed to the sound discretion of the court. *Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health and Rehab. Servs.*, 225 F.3d 1208, 1216 (11th Cir. 2000). Motions for reconsideration are to be filed only when "absolutely necessary," where there is: (1) newly discovered evidence; (2) an intervening development or change in controlling law; or (3) a need to correct a clear error of law or fact. *Bryan v. Murphy*, 246 F. Supp. 2d 1256, 1258-59 (N.D. Ga. 2003). "An error is not 'clear and obvious' if the legal issues are 'at least arguable.' " *United States v. Battle*, 272 F. Supp. 2d 1354, 1358 (N.D. Ga. 2003) (quoting *Am. Home Assurance Co. v. Glenn Estess & Assoc., Inc.*, 763 F.2d 1237, 1239 (11th Cir. 1985)). Also, courts have consistently held that a motion for reconsideration is not to be used as a means to present evidence that should have been raised at the time the original motion was decided. *See, e.g., State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 368 F. Supp. 2d 1296, 1303 (S.D. Fla. 2005), *Burger King Corp. v. Ashland Equities, Inc.,* 181 F. Supp. 2d 1366, 1369 (S.D. Fla. 2002)*; Z.K. Marine Inc. v. M/V Archigetis*, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992). Motions for reconsideration are not

---

[13]      The Court's Civil Local Rules apply to this criminal case in the absence of conflicting criminal rules, statutes, or individual orders. LCrR 1.1C., NDGa.

28

appropriate to present the Court with arguments already heard and dismissed, to repackage familiar arguments, or to show the Court how it "could have done it better" the first time. *Pres. Endangered Areas of Cobb's History, Inc. v. United States Army Corps of Eng'rs.*, 916 F. Supp. 1557, 1560 (N.D. Ga. 1995), *aff'd* 97 F.3d 1242 (11th Cir. 1996). In this case, the government's motion for reconsideration is well-taken.

At a hearing before the District Judge, in which Tolbert was appealing the decision to detain him under the Bail Reform Act ("BRA"), Defendant argued that if the District Court was not going to release him on bond so that he could receive medical treatment for prostate cancer, then he should be transferred to a medical facility within the Bureau of Prisons. [Doc. 51 at 11]. The District Court agreed to order his transfer. [*Id.; see also* Doc. 46].

However, the true extent of Tolbert's treatment was not before the District Judge at the BRA appeal hearing.[14] At a hearing before the undersigned on February 6, 2015, the Court considered the testimony of several witnesses, but particularly Defendant's treating physician, who was treating him on behalf of the U.S. Marshal's

---

[14] Because the evidence submitted concerns Defendant's medical condition, the Court does not discuss the details.

29

Service. [*See* Doc. 52 (sealed)]. The Court found that Defendant's treating physician exceptionally credible, and the record evidence supported the government's contention that Defendant was responding very favorably to his treating physician's treatment regimen as reflected in his PSA test[15] results. The Court further directed that Defendant's next scheduled appointment with his treating physician be accelerated. [*Id.*]. The Court has reviewed the results of Defendant's most recent medical exam, which demonstrate consistent positive progress in the treatment of Defendant's condition. [*See, e.g.,* Doc. 53 at 14 (sealed)]. The Court has been provided with no evidence that Defendant's treatment is below the standard of care or, more importantly, that transferring him to a federal medical facility would result in enhanced, better or different treatment. In fact, any delay in transferring Defendant and his medical records, plus the interruption in care due to his separation from his treating

--------

[15]    "PSA" stands for Prostate-Specific Antigen. The PSA test measures the blood level of PSA, a protein that is produced by the prostate gland. The higher a man's PSA level, the more likely it is that he has prostate cancer. However, there are additional reasons for having an elevated PSA level, and some men who have prostate cancer do not have elevated PSA. The PSA test has been widely used to screen men for prostate cancer. It is also used to monitor men who have been diagnosed with prostate cancer to see if their cancer has recurred after initial treatment or is responding to therapy. National Cancer Institute at the National Institutes of Health, http://www.cancer.gov/cancertopics/types/prostate/psa-fact-sheet (last visited 4/29/2015).

physician, might prove more physically dangerous than keeping Defendant in local custody under the care of his current treating physician.

As a result, the Court **GRANTS** the government's motion for reconsideration, [Doc. 47], and **RECOMMENDS** that the District Judge **VACATE** the order for an emergency medical examination.[16]

### III.   *Conclusion*

For all of the above reasons, the undersigned **GRANTS** the government's motion for reconsideration, [Doc. 47], and **RECOMMENDS** that the District Court **DENY** Defendant's motions to suppress, [Docs. 15, 16], and **VACATE** its December 19, 2014, Order directing Defendant be transferred for an emergency medical examination, [Doc. 46].

All matters referred to the Court have now been ruled upon.  Since the parties have not advised the Court of any impediment to the scheduling of trial, this matter is **CERTIFIED READY FOR TRIAL**.

―――――――――――――――

[16]   The Court recognizes that the District Judge authorized the undersigned to consider the government's motion for reconsideration, and that consistent with that referral came the implicit authorization to reconsider the District Judge's Order.  The undersigned Magistrate Judge simply is not in the business of reconsidering the orders of District Judges–whether authorized or not–and thus the undersigned merely recommends that the District Judge vacate his earlier order now that the record is more complete.

31

**IT IS SO ORDERED, RECOMMENDED and CERTIFIED**, this the 30th day of April, 2015.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE